Filed 5/5/23 Lamons v. Montes CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JONATHAN LAMONS,<br><br>        Plaintiff and Appellant,<br><br>   v.<br><br>MARISELA MONTES, AS COMMISSIONER, ETC., et al.,<br><br>        Defendants and Respondents. | C093834<br><br>(Super. Ct. No. 34-2017-80002550-CU-WM-GDS) |

SUMMARY OF THE APPEAL

Appellant Jonathan LaMons is an inmate with the California Department of Corrections and Rehabilitation (CDCR). He was convicted of first degree murder in 1990 and sentenced to life with the possibility of parole (the commitment offense). He is currently eligible for parole and had parole suitability hearings before the Board of Parole

Hearings (the Board) in 2008, 2012, 2014, and 2016. After each hearing, the Board denied him parole.

He brought an action seeking declaratory, injunctive, and mandate relief against the Board commissioner who presided over his 2012 and 2016 hearings (the presiding commissioner), the executive director of the Board, the secretary of CDCR, and the Governor in their official capacities (defendants). In the operative complaint, which contained 17 causes of action, LaMons stated he was not challenging his underlying sentence or its duration, he was not seeking immediate release, and he was not asking the court to reweigh the evidence considered at his parole hearing. Instead, he was seeking relief for the purposes of governing future Board hearings. LaMons voluntarily dismissed some of his causes of action, the trial court disposed of some in sustaining in part a demurrer brought by defendants, and the trial court disposed of the remaining causes of action at a merits hearing. On appeal, LaMons challenges the trial court's determinations regarding six causes of action, four of which were disposed of on demurrer, and two of which were disposed of at the merits hearing.

In its ruling on the demurrer to the complaint, the trial court observed that the operative complaint in this action "not a model of clarity." LaMons's briefing here suffers from a similar weakness. Based on statements contained in the introduction, the section regarding the standard of review, arguments regarding the correctness of the trial court's ruling on the demurrer, and the two conclusions contained in the argument portion of his opening brief, LaMons's central arguments on appeal can be summarized as follows: California regulations require the Board to consider a prisoner's mental state and allow the Board to consider signs of remorse a prisoner has exhibited when determining if the prisoner is suitable for parole. (See Cal. Code Regs., tit. 15, § 2402, subds. (b) & (d)(3).) Under these requirements, the Board considers a prisoner's " 'insight into causative factors of the crime' " in deciding if a prisoner is suitable for parole. This standard of suitability was used in the 2016 statement of reasons denying

2

LaMons parole. This standard, as applied to LaMons through the statement of reasons, has the effect of requiring LaMons to change his beliefs--or at least to say he has changed his beliefs--as to what the causative factors are that caused him to commit the commitment offense and a prior rape in exchange for securing the benefit of parole. This amounts to an unconstitutional condition on his rights under the First Amendment of the United States Constitution. This court must now weigh "the extent which the government may wield its power to interfere with parole candidates' protected right of freedom to believe and think to achieve its interest in rehabilitation for public safety." LaMons contends "even in a parole suitability determination context where parole is the benefit and" the "beliefs" at issue are "nonpolitical beliefs, the First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its parole candidates' freedom to believe, or not to believe." In short, LaMons argues that he has a First Amendment right to believe a certain set of circumstances caused him to commit murder and rape, and the Board cannot infringe on his right to that belief by compelling him to demonstrate he possesses insight that there is a different (or additional) set of causative factors that played a role. He argues that part of the First Amendment violation caused by the insight requirement stems from the fact that the Board's use of this requirement is overbroad and/or vague.

LaMons argument is in two parts. In the first part, he presents his theory that the insight requirement, as utilized by the Board, violates his First Amendment rights. In the second, he challenges the lower court's ruling at the demurrer phase. To the extent LaMons argues certain causes of action disposed of on demurrer ought to have survived the demurrer phase, his argument is based on his theory, as articulated in the first part of his argument, that the Board's requirement that he develop insight as to the causative factors for his criminal behavior in a way that satisfies the Board violates his First Amendment rights.

3

We find LaMons has failed to demonstrate the Board's use of insight in determining his suitability for parole violates or even implicates his First Amendment rights and, therefore, both parts of his argument fail.

## FACTS AND HISTORY OF THE PROCEEDINGS

The Board's findings with which LaMons takes the most issue are related to his insight regarding causative factors that contributed to his commission of the commitment offense and a sexual assault. We focus on those events and the Board's treatment of them in this background recitation.

### Commitment Offense and Prior Offense

In 1990 LaMons was convicted of the first degree murder of Gary M. Gary M.'s body was found sprawled on a couch in a halfway house, and LaMons was arrested the same day when someone discovered the inside of his jacket was saturated with blood, which was later identified as the victim's. Gary M. had been LaMons's roommate at the halfway house. An autopsy determined Gary M.'s cause of death as blunt head injuries with extensive scalp lacerations, skull fracturing, and cerebral lacerations and contusions. The beating was so severe that police initially believed Gary M. had been shot in the head. Gary M. had been carrying significant cash at the time of his death, and no wallet was found on his body. Although Gary M. carried bullets, he did not carry or possess a gun, residents of the halfway house were not permitted to possess weapons, and a week before Gary M.'s death his room and person had been searched without notice and no weapon was found.

In 1983, LaMons served time following a conviction for battery with serious bodily injury, false imprisonment, and sexual battery. LaMons told both the psychologist who conducted a comprehensive risk assessment (CRA) of him prior to the 2016 hearing and the Board that the conviction was the result of an incident where he and a crime partner raped a prostitute, which he described as a premeditated event.

4

<u>2016</u> <u>Parole</u> <u>Hearing</u>

The 2016 hearing took place in October 2016 before a panel that included the presiding commissioner and a deputy commissioner. LaMons was present with counsel, and a deputy district attorney appeared.

When LaMons discussed the circumstances surrounding the commitment offense, he began by apologizing for lying to the Board about the details of that crime at prior hearings. He said he had told a story about Gary M. pulling a gun on him to avoid the death penalty when entering his plea, and by the time he appeared before a Board panel he was afraid of what would happen if he told the truth. He then recited what he said was the true version of the story:

The day he committed the murder, he was on crack and had asked Gary M. to lend him $10, but a $50 bill was the smallest bill Gary M. had. LaMons saw Gary M. had a stack of bills. LaMons took the $50, and planned to bring back change, but wound up spending almost all of it on crack.

When he returned, he lied to Gary M. and told him he lost the money. LaMons and Gary M. argued, and LaMons went to the bathroom to hide. LaMons claimed he decided he wanted to die, but he lacked the courage to kill himself. He said he decided to kill Gary M. then have the cops kill him, but instead he wound up taking Gary M.'s money and spending it on drugs to get high, and he did not have the courage to have the cops kill him. The cops arrested him, and once LaMons came down from his high he decided he wanted to live. LaMons stated he had decided to tell the truth after the psychologist performing the CRA told him during their meeting that he did not believe LaMons's prior version of the events.

This version of the crime LaMons narrated at the 2016 parole hearing did not appear in the CRA report. When the panel asked him about this discrepancy, LaMons testified he actually told the psychologist at their meeting that he agreed with the

5

psychologist's assessment that he was lying about the murder, but the psychologist had not asked him to elaborate and clean up the story.

After LaMons recounted this new version of the commitment offense, the presiding commissioner noted that the CRA concludes LaMons's prior version lacked credibility, rendering his understanding of the causative factors disingenuous. She said she had trouble with his suggestion that the correct version did not appear in the CRA because the psychologist did not follow-up when LaMons admitted he lied. She said even though LaMons made progress when he decided to stop lying, the Board needed to see more growth on that.

When asked about causative factors that lead him to commit murder, LaMons said they went back to his childhood. He talked about how his father left and was an alcoholic even when present; growing up poor; and having primarily criminals for father figures. He talked about how his mother was a seasonal worker and when she got laid off she would worry about the rent, and it made him feel good to be able to pay it by selling marijuana. He said besides being raised around criminal elements, the biggest causative factor was seeing a friend of his die in a military training exercise. This caused him to have post-traumatic stress disorder (PTSD), which he believed contributed to his drug abuse which, along with depression, caused him to spiral out of control. When a deputy commissioner asked LaMons about causative factors beyond drugs, LaMons mentioned understanding rejection, dealing with his emotions, and maturing; and understanding that what he does has consequences.

When the panel asked LaMons about the circumstances of his 1983 sexual battery conviction, LaMons said, "[a]ny answer that I would give to that would sound like a justification. There is no justification for that." When pressed further, he explained that at a young age he was exposed to pornography and developed a rape fantasy. He said he and a friend with a similar fantasy lured a prostitute into a car, and they both raped her. He said the incident was the only time he ever raped a woman. He explained it never

6

happened again because going to prison for a 90-day observation following the sexual assault was a wakeup call that eliminated his rape fantasy. When asked when and how he had determined his childhood exposure to pornography had caused him to develop a rape fantasy, he responded that during victim impact groups he learned there was a pattern between early exposure to porn and acting out something later in life. LaMons also testified the rape occurred following the downward spiral he found himself in following the trauma of seeing his friend killed.

In addition to discussing the commitment offense and the rape, the panel discussed a number of other factors with LaMons at the hearing. The panel and LaMons discussed his past and present family relationships, his level of education and employment status at the time he committed the commitment offense, and his drug use prior to incarceration and some consequences of that drug use. They discussed LaMons's life in prison; including membership and rise to power in a prison gang until approximately 2006 or 2007; his conversion to; his participation in drug rehabilitation programs, mental health programs, and victim impact groups; efforts to advance his education, including earning a paralegal degree; and his work history, for which he received generally good reports. LaMons acknowledged that while he knows he is not allowed to charge others for legal work, he sometimes expects compensation from others when he assists them with legal matters. The panel and LaMons also discussed his plans for reentry into society if the Board granted him parole.

### Parole Decision

The panel concluded LaMons posed an unreasonable risk of danger to society or a threat to public safety and that he was not suitable for parole at that time. The presiding commissioner gave the Board's decision on the record. The presiding commissioner stated, "the fundamental consideration in making our decision is the potential threat to public safety that [LaMons] would pose upon release under the current circumstances."

7

The panel observed there were some factors in favor of suitability, but those were outweighed by factors that tend to show unsuitability.

The panel noted that the life offense was committed in a rather gruesome and vicious manner, and the victim had been vulnerable. The presiding commissioner also noted LaMons's prior record of violence, including the rape, and an "unstable social history" that served as static factors, which standing alone and in light of his lengthy period of rehabilitation would not necessarily indicate he was still a risk to public safety. However, the panel found there were "other circumstances that when we combine them with those static factors, led us to the conclusion that you still pose a risk to the . . . public safety." The presiding commissioner identified the "principle concerns" in contribution as, "around serious misconduct, your lack of insight into the causative factors for the crime, a lack of self-help to deal specifically with all of the issues that may have contributed to your criminality as well as a portion of the Risk Assessment that speaks to sexual re-offense."

The serious misconduct the panel identified included, among other things, his prior involvement in a prison gang, and the fact that he was performing legal services for inmates in exchange for gifts and compensation, which he knew to be in violation of rules. The panel felt the acceptance of compensation in contravention of the rules reflected "longstanding deep-seated criminal thinking. You continue to violate the rules, openly, and as if the rules don't apply to you."

The presiding commissioner then detailed the panel's concerns regarding LaMons's insight into the causative factors for his crimes. She stated, "we were very concerned with your lack of insight into the causative factors of the crime and some minimization that we heard throughout the hearing." She noted the panel wanted to give him credit for deciding to be more truthful about the commitment offense, but stated that "you need to come clean with all aspects of your criminality and you need to understand why it is that you committed all of these offenses. And when asked, after talking to you

8

about the rape, and after talking to you about this crime, about your substance abuse, essentially you point to external factors. You know, whether it's the rape and you -- what do you do? You talk to us about your father's porno magazines. That you saw his porn magazines and that imprinted an idea in your head, in fact, a sexual fantasy to rape a woman. So it's minimization on your part. You're pointing -- it's almost like you're blaming these magazines or you're blaming your father, but you're not taking responsibility. You talk about the life crime. We thought that your motivations, you know, I don't know -- I don't know if you were looking for sympathy or what, but you gave us a story about PTSD, seeing your friend killed and so you had lost your job and you had lost your girlfriend and you suffered all this loss. And then you'd lost your apartment. And so how all that amounts to your bludgeoning an acquaintance, if not a friend, to death for a couple of hundred dollars, just, we don't see the nexus. We don't see the tie there. You really have not examined your character issues, your personality traits, those aspects of Mr. LaMons that would lead him to commit such an egregious, such a brutal act of violence."

The presiding commissioner also said, "there are some characterological issues that you still haven't come to terms with or least you haven't shared them with us at this point. And I don't believe that they have to do with having grown up in a poor neighborhood or some of the other things that you tried to point to today. Because, again, those are external factors and there are just too many, you know, millions of children who grow up in that kind of environment and don't go out and kill an innocent victim the way you did." She stated, "that requires more exploration on your part."

The presiding commissioner felt LaMons was parsing words and not being honest and forthcoming during the hearing. She felt his affect suggested he was focusing more on telling the panel what they wanted to hear than on telling the truth. She stated the panel suspected this was because, "you really have not come to full -- to full truth about yourself and why you committed this crime. How it is that you could become so

animalistic so as to commit such a horrific crime to an innocent vulnerable victim. You haven't come to terms with it. It's like something that you have shut away in a drawer and you don't really want to deal with. You share some of the facts, stuff that's already on paper. But what about the deeper stuff, about you and who you were? Maybe that's not who you are today, maybe. But there are some aspects that are still there, the deceitfulness, the duplicitiveness [*sic*], the dishonesty. All of that needs to be dealt with. So all of that is in the area of your past and present mental state toward the crime, your understanding of the crime, your credibility. All of those are kind of rolled into that."

With respect to the rape specifically, the presiding commissioner stated she felt he was still minimizing the rape when he told the psychiatrist duing his assessment and the panel that he and the codefendant were essentially fulfilling a sexual fantasy when they committed the rape. She emphasized the crime was, in actuality, "a violent sexual assault" and not a fantasy, and that LaMons needs "to come to grips with that act of violence towards a vulnerable victim. Two on one. You need to come [to] terms with what it is that would allow you to treat another human being, and particularly, a vulnerable female in that way. And I'm not going to give you the answers, but there's a lot that goes through my mind and you really need to research that, figure out why people commit rapes and violent sexual assaults. Because that's what you did. And I don't think, you know, we can't blame your dad's porn collection for that. That was you. That was all you. So I don't see that you've done any work to deal with those issues. So in the absence of that, we have to conclude that you still have some of those tendencies. Because you haven't dealt with them yet."

Proceedings in the Trial Court

LaMons filed the operative pleading in this action, the Second Amended Complaint for Declaratory Relief and Injunctive Relief, with a Petition for a Writ of Mandate (complaint), on March 1, 2018. Though, the complaint contains 17 causes of

10

action, in his opening brief, LaMons writes, "[t]he relevant causes of action at issue in this appeal are the third, fourth, fifth, sixth, seventh, and eighth."

The third, fourth, fifth, sixth, and eighth causes of action all allege some form of violation of the First Amendment of the United States Constitution. LaMons claims each of his First Amendment violation causes of action is brought under section 1983 of title 42 of the United States Code which allows persons to bring actions alleging a person has violated a right protected by the Constitution, "under color of any statute, ordinance, regulation, custom, or usage, of any State." He also enlists in his argument the free speech clause of the California Constitution.

In the third cause of action, LaMons alleges that the Board requires parole candidates to change their expressions, thoughts, feelings, and beliefs in violation of the First Amendment of the United States Constitution and the free speech clause of the California Constitution. In the fourth cause of action, LaMons alleges the Board violated his rights under the First Amendment of the United States Constitution and the free speech clause of the California Constitution by using criteria for suitability that are overbroad. In the fifth cause of action, LaMons alleges the Board violated his rights under the First Amendment of the United States Constitution and the free speech clause of the California Constitution by using criteria for suitability that are impermissibly vague. In the sixth cause of action, LaMons alleges the Board violated his rights under the First Amendment of the United States Constitution and the free speech clause of the California Constitution by not providing full disclosure of the suitability criteria. In the eighth cause of action, LaMons alleges the Board violated his rights under the First Amendment of the United States Constitution and the free speech clause of the California Constitution by not providing him the resources needed to meet the "content-based compelled speech criteria" of the Board.

The seventh cause of action alleges defendants violated LaMons's right to due process under the California Constitution, Article I, Sec. 7 (a) and Fourteenth

11

Amendment of the United Stated Constitution by not providing "the wherewithal to meet the suitability criteria of the [Board]."

The third, sixth, seventh, and eighth causes of action were decided below when the trial court sustained defendants' demurrer to those causes of action without leave to amend. In ruling on the demurrer, in response to an argument raised by defendants regarding the first through fifth causes of action, the trial court explained that declaratory relief was not available to the extent that LaMons sought "relief regarding the adequacy or outcome of his prior parole hearings," but that the unavailability of one potential remedy did not serve as a sufficient basis to sustain the demurrer to those causes of action, because other relief might be available. The fourth and fifth causes of action were eliminated as part of the trial court's order denying LaMons's petition for writ relief and entering judgment in favor of the defendants.

## DISCUSSION

### I

*Standard and Principles of Review*

"As in all First Amendment cases, our standard of review is de novo." (*San Jose Mercury News, Inc. v. Criminal Grand Jury* (2004) 122 Cal.App.4th 410, 415.) However, our application of de novo review does not change the fact that a fundamental rule of appellate review is that an appealed judgment or order is presumed correct. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609 [applying the rule to explain the importance of providing a sufficient record]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [applying rule in reviewing a motion for summary judgment ruling]; *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684 ["[A]lthough we use a de novo standard of review here, we do not transform into a trial court. . . . Therefore, [o]n review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court." (Internal citations and quotes removed)].)

12

Appellant's burden includes the obligation to present argument and legal authority on each point raised. This obligation requires more than simply stating a bare assertion that the judgment "is erroneous and leaving it to the appellate court to figure out why; it is not the appellate court's role to construct theories or arguments that would undermine the judgment and defeat the presumption of correctness." (Eisenberg et. al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2022) ¶ 8:17.1; see also *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 565 [quoting Eisenberg when finding an appellant's First Amendment argument could not prevail on the grounds the appellant failed to "develop a reasoned argument supported by legal authority"]; *Lee v. Kim* (2019) 41 Cal.App.5th 705, 721 [quoting Eisenberg]; *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368 ["This court is not inclined to act as counsel . . . for . . . any appellant and furnish a legal argument"].)

To the extent arguments are supported by dissenting opinions, we note that it is axiomatic that dissents are not controlling precedent. We also do not consider arguments based on citations to opinions that have been vacated or withdrawn.

II

*Positions Lacking Citations*

" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]' (9 Witkin, Cal. Procedure, (3d ed. 1985) Appeal, § 479, p. 469; see also *People v. Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15 []; *Duncan v. Ramish* (1904) 142 Cal. 686, 689-690 [].)" (*People v. Stanley* (1995) 10 Cal.4th 764, 793; accord *Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1102.)

Though LaMons claims in his opening brief that the seventh cause of action is at issue in this appeal, he does not make any argument -- let alone provide any citation in

13

support of an argument -- that his due process rights have been violated. As such, we do not consider whether the Board's practices violate due process.

Likewise, LaMons states in his opening brief that he has alleged his rights under "equivalent clauses of the California Constitution" have also been violated. However, in his opening brief, LaMons makes no effort to explain and provides no legal authority regarding the contours of his free speech rights under the California Constitution and how they overlap with or vary from rights under the First Amendment of the United States Constitution. As such, we also do not consider whether his rights to free speech have been violated under the California Constitution. (See Cal. Rule of Court, rule 8.204(a)(1)(B) ["Each brief must: [¶] . . . State each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"].)

## III

*The Use of Insight and LaMons's First Amendment Claims*

### A. The Parole Process and the Role of Insight in Board Deliberations

Persons sentenced to indeterminant sentences, like LaMons, "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1078.) Life inmates' actual confinement periods are decided through a hearing process before the Board. (See Pen. Code, §§ 3041, 5075.1, subd. (a).)

Penal Code section 3041 describes how the Board is to make decisions for indeterminate life inmates. Under subdivision (a)(2), a panel of two or more commissioners and deputy commissioners, though no more than one member can be a deputy, must meet with the inmate one year before his minimum parole eligibility date and "normally grant parole." However, if the panel "determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past

14

convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual," it is need not grant parole. (Pen. Code, § 3041, subd. (b)(1).)

When the Board decides to deny parole, it must "send the inmate a written statement setting forth the reason or reasons for denying parole, and suggest activities in which he or she might participate that will benefit him or her while he or she is incarcerated." (Pen. Code, § 3041.5, subd. (b).) Additionally, it needs to set a hearing at a future date, as little as three and as many as 15 years later, to reconsider the inmate's eligibility for parole. (Pen. Code, § 3041.5, subd. (b)(3).) Any future hearing is conducted as "a de novo hearing. Findings made and conclusions reached in a prior parole hearing shall be considered in but shall not be deemed to be binding upon subsequent parole hearings for an inmate, but shall be subject to reconsideration based upon changed facts and circumstances." (Pen. Code, § 3041.5, subd. (c).)

These governing statutes reflect an "underlying legislative intent that the Board and the Governor consider an inmate's rehabilitation when evaluating parole suitability." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1220, fn. 19 (*Lawrence*).) The Board's criteria and guidelines governing panels considering parole for prisoners sentenced to life terms for first or second degree murder after November 8, 1978, are contained in sections 2400-2402 of title 15 of the California Code of Regulations. Under the guidelines, "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).)

"All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the

15

base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

The regulations identify as "general guidelines" circumstances that "tend to indicate unsuitability" as including both certain circumstances surrounding the life-offense and incidents of violence prior to the life-offense. (Cal. Code Regs., tit. 15, § 2402, subds. (c)(1) &(3).) The regulations also identify as "general guidelines" circumstances that "tend to show that the prisoner is suitable for release." (Cal. Code Regs., tit. 15, § 2402, subd. (d).) One of the factors is identified as, "Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense." (Cal. Code Regs., tit. 15, § 2402, subd. (d)(3).)

The regulations do not specifically state that the Board can consider a prisoner's "insight" into his previous violent crimes when deciding whether to grant parole. However, in *In re Shaputis* (2008) 44 Cal.4th 1241, 1245-1246 (*Shaputis I*), our Supreme Court concluded the Governor's decision to deny parole because a prisoner remained a threat to public safety was supported by " 'some evidence' " that the plaintiff remained a threat, when the Governor's decision was based, in part, on a prisoner's failure to "gain insight into his previous violent behavior."

In a later decision, *In re Shaputis* (2011) 53 Cal.4th 192, 200 (*Shaputis II*), the Court took the opportunity to "offer some general guidance to the Courts of Appeal on

inmates' lack of insight as a parole unsuitability factor," which is helpful in considering the arguments here.

First, the Court observed that the regulations direct the Board to consider factors -- specifically the inmate's past and present attitude about the crime and presence of remorse -- that "fit comfortably within the descriptive category of 'insight.' " (*Shaputis II, supra,* 53 Cal.4th at p. 218; accord *In re Poole* (2018) 24 Cal.App.5th 965, 973.) Second, it pointed to case law in which the California courts had recognized that an absence of insight "is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Shaputis II*, *supra*, 53 Cal.4th at p. 218, citing *Shaputis I*, *supra*, 44 Cal.4th at pp. 1260-1261 and *Lawrence, supra,* 44 Cal.4th at p. 1209.) Third, the Court observed that the suitability and unsuitability factors identified in the regulations "are not intended to function as comprehensive objective standards," but, rather, as set forth as general guidelines, and " 'the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.' (Regs., § 2402, subds. (c) & (d).)" (*Shaputis II*, *supra*, 53 Cal.4th at p. 218.) Coupled with the regulatory requirement that the panel consider, "[a]ll relevant, reliable information" available when determining an inmate's suitability for parole, the court found, "the inmate's insight into not just the commitment offense, but also his or her other antisocial behavior, is a proper consideration." (*Ibid.*, citing Cal. Code Regs., tit. 15, § 2402, subd. (b).)

The Court also noted that while "insight" might be a "particularly subjective factor, amounting to a conclusion drawn from other evidence, we note that a finding on insight is no more subjective or conclusory than a finding on the inmate's 'past and present mental state.' (Regs., § 2402, subd. (b).) Furthermore, it has long been recognized that a parole suitability decision is an 'attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional

17

antisocial acts.' ([*In re* ]*Rosenkrantz*[ (2002)] 29 Cal.4th [616,] 655; see *In re Sturm*[ (1974)] 11 Cal.3d [258,] 266.) Past criminal conduct and current attitudes toward that conduct may both be significant predictors of an inmate's future behavior should parole be granted. (*Lawrence*, *supra*, 44 Cal.4th at p. 1213; *Shaputis I*, *supra*, 44 Cal.4th at pp. 1259–1260.)" (*Shaputis II*, *supra*, 53 Cal.4th at p. 219.)

In *In re Ryner* (2011) 196 Cal.App.4th 533, 548-549, the Sixth District Court of Appeal articulated some limits on the role of "insight" evidence in ascertaining an inmate's current dangerousness: "Evidence of lack of insight is indicative of a current dangerousness only if it shows a *material* deficiency in an inmate's understanding and acceptance of responsibility for the crime. To put it another way, the finding that an inmate lacks insight must be based on a factually identifiable deficiency in perception and understanding, a deficiency that involves an aspect of the criminal conduct or its causes that are significant, and the deficiency by itself or together with the commitment offense has some rational tendency to show that the inmate currently poses an unreasonable risk of danger." (Fn. omitted; accord *In re Poole, supra,* 24 Cal.App.5th at p. 974.)

B.      The Doctrine of Unconstitutional Conditions

The doctrine of unconstitutional conditions has arisen out of recognition "that 'constitutional violations may arise from the deterrent, or "chilling," effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights,' *Laird v. Tatum*, 408 U.S. 1, 11, [ ] (1972) . . . ." (*Bd. of County Comm'rs v. Umbehr* (1996) 518 U.S. 668, 674.) Under the doctrine, "[f]or at least [three quarters of a century], [the U.S. Supreme] Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that

18

infringes his constitutionally protected interests -- especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser v. Randall*[ (1958)] 357 U.S. 513, 526. Such interference with constitutional rights is impermissible." (*Perry v. Sindermann* (1972) 408 U.S. 593, 597; see also *California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 457 ["As a general matter, the unconstitutional conditions doctrine imposes special restrictions upon the government's otherwise broad authority to condition the grant of a privilege or benefit when a proposed condition requires the individual to give up or refrain from exercising a constitutional right"].) The doctrine, "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." (*Koontz v. St. Johns River Water Mgmt. Dist.* (2013) 570 U.S. 595, 604.)

When the receipt of a public benefit is conditioned on the waiver of a constitutional right, "however well-informed and voluntary that waiver, the governmental entity seeking to impose those conditions must establish: (1) that the conditions reasonably relate to the purposes sought by the legislation which confers the benefit; (2) that the value accruing to the public from imposition of those conditions manifestly outweighs any resulting impairment of constitutional rights; and (3) that there are available no alternative means less subversive of constitutional right, narrowly drawn so as to correlate more closely with the purposes contemplated by conferring the benefit." (*Parrish v. Civil Service Com.* (1967) 66 Cal.2d 260, 271-272; accord *Robbins v. Superior Court* (1985) 38 Cal.3d 199, 213-214.) As demonstrated by the cases cited by LaMons, a standard scenario in which the constitutional conditions doctrine has been applied by the United States Supreme Court to vindicate First Amendment rights is one in which a person's ability to engage in their professional occupation has been somehow

19

conditioned on their sacrificing the ability to maintain certain political associations, to make political speech, or to speak or not speak on matters of public concern. (See *Janus v. AFSCME, Council 31* (2018) \_\_\_U.S.\_\_\_ [201 L.Ed.2d 924, 934] [finding a state's extraction of agency fees to support union activities from nonconsenting public-sector employees including those employees who opted not to join the union and objected to the union's positions in collective bargaining violates the First Amendment]; *Bd. of County Comm'rs v. Umbehr, supra,* 518 U.S. at pp. 671, 673, 686 [recognizing the right of independent government contractors not to be terminated for exercising their First Amendment rights to criticize local elected officials]; *Rutan v. Republican Party* (1990) 497 U.S. 62, 65 [promotion, transfer, recall, and hiring decisions involving low-level public employees may not be constitutionally based on political party affiliation and support]; *Branti v. Finkel* (1980) 445 U.S. 507, 508, 520 [upholding an injunction barring a public defender from terminating assistant public defenders on purely political grounds -- i.e., because they were members of or associated with the Republican party]; *Baird v. State Bar of Arizona* (1971) 401 U.S. 1, 4-5, 7 [finding a state bar admissions committee committed error when it refused to process an application for a license to practice law on the grounds that the applicant had refused to answer a question that asked, "whether she had ever been a member of the Communist Party or any organization 'that advocates overthrow of the United States Government by force or violence' "; fn. omitted]; *Perry v. Sindermann, supra,* 408 U.S. at p. 595 [community college instructor alleged governing board did not rehire him based on his public criticism of the policies of administration, infringing his right to freedom of speech]; *Elrod v. Burns* (1976) 427 U.S. 347, 355-356 [explained how practice of requiring employees to pledge allegiance to a particular political party restricted belief and association].)

Here, the benefit at issue is parole, and the constitutional right LaMons claims is at issue is the freedom of speech and belief under the First Amendment of the U.S. Constitution.

C.     The Use of Insight Here Did Not Implicate a First Amendment Right

Under the First Amendment of the United States Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The Fourteenth Amendment of the United States Constitution makes the First Amendment applicable to the states. (*Murdock v. Pennsylvania* (1943) 319 U.S. 105, 108, 121.)

In the seminal First Amendment case *West Virginia State Board of Education v. Barnette* (1943) 319 U.S. 624, 642 (*Barnette*), the United States Supreme Court described "the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." The Court explained, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us." (*Ibid.*, fn. omitted; accord *Elrod v. Burns, supra,* 427 U.S. at p. 356.)

"[A]t the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." (*Abood v. Detroit Bd. of Educ.* (1977) 431 U.S. 209, 234-235.) This right of freedom of thought protected by the First Amendment, "includes both the right to speak freely and the right to refrain from speaking at all. [Citation.] A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." (*Wooley v. Maynard* (1977) 430 U.S. 705, 714.)

"The leading cases on compelled speech reflect the principle that no law may require a speaker to adopt a political or ideological viewpoint imposed by government."

21

(*Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 346.) " '[P]olitical speech' is speech that deals with ' "governmental affairs" ' (*First National Bank of Boston v. Bellotti*[ (1978)] 435 U.S. [765,] 777 [], and 'ideological speech' (*Schad v. Mount Ephraim* (1981) 452 U.S. 61, 65 []) is speech that apparently concerns itself with 'philosophical,' 'social,' 'artistic,' 'economic,' 'literary,' 'ethical,' and similar matters (*Abood v. Detroit Board of Education*, *supra*, 431 U.S. at p. 231 [] [considering the First Amendment's right to 'freedom' of 'association,' which is evidently embraced by its right to freedom of speech])." (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 486.)

As a preliminary matter, here, as the defendants and the trial court have noted, *Shaputis II* recognizes, an "inmate has a right to decline to participate in psychological evaluation and in the hearing itself. That decision may not be held against the inmate." *Shaputis II*, *supra*, 53 Cal.4th at p. 221; accord *In re Hunter* (2012) 205 Cal.App.4th 1529, 1537, fn. 4.) Accordingly, there is no express requirement that LaMons speak to the psychologist or Board *at all.*

LaMons argues this recognized right to not speak is "irrelevant" because "once the Board has evidence of what it considers an unacceptable belief or viewpoint of causative factors of the crime, under due process standards a Board may [*sic*] continue to deny parole based on that evidence until new evidence is supplied by the parole candidate of holding an acceptable belief or viewpoint." Therefore, he reasons, the Board will continue to deny him the benefit of parole until he supplies evidence that his "belief" as to the causative factors that led hm to commit crimes has changed. (But, even assuming this is correct, LaMons has failed to demonstrate that asking potential parolees to provide evidence -- e.g., testimony or a CRA prepared after they participate in an evaluation -- that they have insight regarding and otherwise understand the causative factors that led them to commit crime forces them to "proselytize religious, political, and ideological causes" that are repugnant to their beliefs. (See *Wooley v. Maynard, supra,* 430 U.S. at

22

p. 714.) "[T]he First Amendment's right to freedom of speech is not unlimited. . . . Indeed, it was 'not intended' to embrace all subjects. (*Roth v. United States* (1957) 354 U.S. 476, 483 [] . . . .)" (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 486.)

The U.S. Supreme Court has "acknowledged that the First Amendment . . . does not guarantee absolute freedom of speech." (*Bd. of County Comm'rs v. Umbehr, supra,* 518 U.S. at p. 675.) LaMons fails to convince us that the Board's consideration of insight, and its desire that he more fully understand what caused him to commit crimes, will (1) compel him to utter ideological or political speech that is antithetical to "the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control" as recognized in *Barnette, supra,* 319 U.S. at p. 642; or (2) otherwise tread on his freedom of thought in a way that intrudes on his First Amendment rights.

### D. LaMons's Overbreadth and Vagueness Arguments Fail

LaMons argues the trial court erred in concluding the panel's consideration of insight into causative factors was neither overbroad nor impermissibly vague.

With respect to overbreadth, LaMons argues, "when the government conditions a benefit on the beliefs of individuals, the means to do so must be precise and narrowly tailored to the government's legitimate interests." To support this proposition, LaMons cites (without a jump cite) *Elrod v. Burns, supra,* 427 U.S. 347. But, *Elrod* specifically concerned itself with the First Amendment protections applicable to "*political* belief and association," which the Court identified as "the core of those activities protected by the First Amendment." (*Elrod v. Burns, supra,* 427 U.S. at p. 356.) Here, we have concluded that LaMons's belief as to what the causative factors of his crimes were do not warrant First Amendment protections on par with political beliefs. Therefore, his overbreadth argument fails.

Similarly, in advancing his vagueness argument, LaMons begins with the proposition that "[b]ased on the above argument, the First Amendment is implied; therefore, the next question is whether the 'insight into causative factors of the crime' condition is impermissibly vague." Since we find unpersuasive his argument that his First Amendment rights have been implicated by the Board's use of "insight into causative factors," we need not consider his vagueness argument.

E.    *Parrish v. Civil Service Com.* (1967) 66 Cal.2d 260 Analysis

Because LaMons has failed to persuade us that the Board's use of insight here has the effect of applying the Board's statutory authority and regulations to require he relinquish a constitutional right to possess certain "beliefs" about the causative factors of his criminality, that use does not necessitate a *Parrish v. Civil Service Com., supra,* 66 Cal.2d at pp. 271-272 analysis here.

IV

*Demurrer Issues*

In section II of the argument contained in his opening brief, LaMons argues the trial court erred in sustaining the demurrer to his third, sixth, and eighth causes of action. He also argues the trial court erred in "dismissing the prayer for declaratory relief."

LaMons's arguments as to why he believes the trial court erred in sustaining the demurrer to the three causes of action all rely on his position that the Board's insight requirement -- particularly as considered by the Board at his 2016 hearing and articulated in the statement of decision -- is an unconstitutional condition that penalizes his right to maintain certain beliefs by denying him the benefit parole. Because LaMons has failed to persuade us that the Board's use of insight unconstitutionally impinges his exercise of a First Amendment right, his arguments challenging the trial court's ruling on the demurrers to the third, sixth, and eight causes of action also fail.

24

With respect to LaMons's argument that the trial court erred when it "sustained defendants' demurrer on LaMons'[s] request for declaratory relief" it greatly mischaracterizes the trial court's ruling on the demurrer contained in the record before us. To begin with, while the trial court did say declaratory relief regarding the "adequacy or outcome of his prior [Board] hearings" was not an available remedy, it did not expressly "sustain" a demurrer to requests for declaratory relief. Instead, it concluded that while declaratory relief might not be an available remedy to address the "outcome of his prior parole hearings," the unavailability of that remedy did not foreclose the possibility of other relief. Accordingly, the trial court overruled defendants' demurrer to five causes of action to the extent the demurrer was based on LaMons's failure to seek a proper form of relief. Additionally, LaMons has failed to convince us (a) that the trial court erred in sustaining a demurrer to some causes of action on the basis that they failed to state a claim -- i.e., that they failed to suggest he was entitled to *any* relief; or (b) that the trial court made an incorrect ruling disposing of the entire action when it found the causes of action that survived demurrer, abandonment, and dismissal lacked merit. Thus, whether the court properly concluded declaratory relief was not a proper form of relief in some instances is moot, because LaMons has not proven he is entitled to any relief in any form.

DISPOSITION

The judgment is affirmed.

_____
HULL, J.

We concur:

_____
ROBIE, Acting P. J.

_____
DUARTE, J.